**Mark T. WHEELIHAN; and Harley–Davidson of Greensboro, Inc., Plaintiffs,**

v.

**Edna J. BINGHAM, as Trustee of the Bingham 1990 Trust U.D.T., Defendant.**

**No. CIV.1:04 CV 00149.**

United States District Court, M.D. North Carolina.

Nov. 15, 2004.

Lyn K. Broom, Leslie Cooper Harrell, Smith Moore, L.L.P., Greensboro, NC, for plaintiff and counter–defendants.

John S. Arrowood, James McElroy & Diehl, P.A., Charlotte, NC, for defendant and counter–claimant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs, in their amended complaint filed July 6, 2004, seek a declaratory judgment against Defendant, Edna J. Bingham, in her capacity as trustee for the Bingham 1990 Trust U.D.T. (the "Trust"), striking certain provisions of the shareholders' agreement governing the parties' ownership rights in Harley–Davidson of Greensboro, Inc. (the "Company"), or, in the alternative, construing disputed terms of the agreement in their favor.[1]  Defen-

---

1. Plaintiffs initially filed this action in the General Court of Justice, Superior Court Divi-

dant, in her amended answer, asserts counterclaims for breach of contract, conversion, declaratory judgment, and injunctive relief, each arising out of the disputed terms of the shareholders' agreement and insurance proceeds paid to the Company thereunder. Before the court is Defendant's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, in which she asks the court to order the Company to post a $2,000,000 bond to secure her expected judgment. For the reasons set forth below, Defendant's motion will be denied.

## FACTS

Mark Wheelihan, his wife, Judith Wheelihan, and J. Gordon Bingham and his wife, Edna J. Bingham, as trustees for the Trust, formed the North Carolina corporation Harley–Davidson of Greensboro, Inc., in 1998. On May 8, 1998, they signed an Agreement Among Shareholders describing their rights and duties as shareholders of the Company. An Amended and Restated Agreement Among Shareholders was executed on March 22, 2002 (the "2002 Agreement"). Under the 2002 Agreement, Mark Wheelihan held 510 shares of the Company, Judith Wheelihan held 240 shares, and the Trust held 250 shares. Mark Wheelihan ultimately took ownership of a total of 750 shares when Judith Wheelihan, upon the couple's separation, transferred her shares to him. Mark Wheelihan was named president of the Company and J. Gordon Bingham was named a vice president; both were named to the board of directors.

The 2002 Agreement, in effect at all times relevant here, includes a share repurchase provision requiring the Company, upon the death of either Mr. Wheelihan or Mr. Bingham, to repurchase the shares of the deceased shareholder.[2] Mr. Bingham's death on June 4, 2003, set in motion the 2002 Agreement's share valuation and repurchase mechanisms. The 2002 Agreement requires the surviving parties to "fix the valuation of shares by mutual consent according to their determination of the fair market value of the corporation" but "if the parties fail to fix the valuation of shares by mutual consent, the valuation shall be determined by the independent public accountants of the Company. Should the estate representative of the Shareholder not agree with the fair market value determined by such accountants, he or she may appoint ... another independent public accountant, and the two shall jointly determine the fair market value." (2002 Agreement, ¶¶ 5(a)(1) and (2), attached as Ex. B to Pls.' Am. Compl.) The Company's accountant assessed the value of the entire company at $800,000; Defendant has not performed an independent assessment.

The 2002 Agreement required the Company to purchase life insurance policies on Mark Wheelihan and J. Gordon Bingham "to assure that all or a substantial part of the purchase price" of a deceased shareholder's shares "be available immediately in cash upon his death." (*Id.* at ¶ 5(a)(3).) J. Gordon Bingham's life was insured for $2,000,000 and Mark Wheelihan's life was insured for $7,000,000. The Company was named as the beneficiary and owner of

---

sion of Guilford County, North Carolina, on January 9, 2004. On February 12, 2004, Defendant removed the action pursuant to 28 U.S.C. §§ 1441 and 1446, asserting this court's original jurisdiction under 28 U.S.C. § 1332 based on the diversity of citizenship of the parties.

**2.** The shareholder is the Trust, not J. Gordon Bingham personally, but the 2002 Agreement stipulated that for the purposes of executing the terms of the agreement, J. Gordon Bingham would be deemed owner of the Trust's shares.

each policy and paid all premiums on the policies. Plaintiffs assert that the insurance policies were keyman policies, designed to protect the Company and provide it with sufficient cash to weather the loss of a key businessman. Defendant counters that the purpose of the policies was that expressly stated in the 2002 Agreement—to provide cash to pay to the deceased shareholder's estate for his shares of the Company.

The 2002 Agreement further stated that "in the event that the insurance proceeds ... exceed the fair market value ..., then the fair market value shall be deemed to be the amount of the insurance proceeds." (*Id.* at ¶ 5(a)(2).) It is this provision that lies at the heart of the present dispute: Plaintiffs assert that the provision was included in the 2002 Agreement in error and ask the court to declare it of no effect. Defendant asserts that the provision must be strictly enforced and demands specific performance of the contract. The parties further disagree as to the meaning of the provision if it remains in effect. Plaintiffs contend that if anything is linked to the insurance proceeds, it is not the "valuation" of the Trust's shares but the "fair market value" of the entire Company, and the Defendant is entitled only to her proportional share, or 25%, thereof. The Defendant contends that the value of the Trust's shares, not the entire Company, is linked to the insurance proceeds, thereby entitling her to the entire $2,000,000.

## DISCUSSION

■ "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Sun Microsystems, Inc. v. Microsoft Corp. (In Re: Microsoft Corp. Antitrust Litig.),* 333 F.3d 517, 525 (4th Cir.2003). A preliminary injunction is, however, an "extraordinary remedy" that should be granted "only in the limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1991). The relief requested here, the posting of a $2,000,000 bond to secure the Defendant's hoped-for judgment, would not, of course, preserve the status quo, but may significantly change the Plaintiffs' financial position. Such relief, which the Defendant concedes is of a type rarely granted, is therefore akin to a mandatory preliminary injunction. Mandatory preliminary injunctions are granted even more rarely than prohibitory preliminary injunctions. See *Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980) (noting that "the authority of the district court judge to issue a preliminary injunction, especially a mandatory one[,] should be sparingly exercised"). Thus, "a mandatory preliminary injunction must be necessary ... to protect against irreparable harm in a deteriorating circumstance created by the [nonmoving party]." *Sun Microsystems, Inc.,* 333 F.3d at 526.

■ Defendant must, therefore, demonstrate a need not just to preserve the status quo, but to protect herself against irreparably worsening conditions caused by Plaintiffs. Even if such a showing is made, Defendant must also satisfy the requirements described in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 194–96 (4th Cir.1977), before she can secure the preliminary injunction she seeks.[3]

---

**3.** Defendant, in her amended motion for a preliminary injunction, emphasizes case law recognizing this court's power to grant the relief sought here, presumably because, as

Defendant acknowledges, such relief is particularly uncommon. Because the court deems the relief sought to be the equivalent of a mandatory preliminary injunction, the power

■ "When deciding whether to grant a preliminary injunction, the court must first determine whether the [movant] has made a strong showing of irreparable harm if the injunction is denied." *Scott's Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir.2002). If denying the preliminary injunction will not result in irreparable harm, "[the] preliminary injunction should not be considered." *Sun Microsystems*, 333 F.3d at 526. Defendant initially sought an injunction to prevent the Company from spending the insurance proceeds paid to it upon the death of J. Gordon Bingham because, under her reading of the 2002 Agreement, the entire $2,000,000 is owed to the Trust. Defendant amended her motion for a preliminary injunction to demand a $2,000,000 bond when she learned that the Company had already spent the insurance proceeds. The harm Defendant feared at the outset—that, in the absence of the insurance proceeds, the Company would not have enough money to pay the full amount owed to her under the 2002 Agreement—has already come to pass. The money is gone, and the Company may well lack the liquidity to pay a $2,000,000 judgment rendered against it. The expenditure of the insurance proceeds itself, however, is not evidence that Defendant's position is one of deteriorating circumstances warranting a mandatory preliminary injunction. That is, Defendant does not demonstrate that the Company is lurching towards insolvency or, in addition to exhausting the insurance proceeds, is otherwise disposing of assets in a manner that will make it less able to satisfy a judgment after a trial on the merits than it is now. Defendant has not made the requisite "strong showing" of irreparable harm if the preliminary injunction is denied and her motion need not be given any further consideration.

■ Assuming, *arguendo*, that Defendant had demonstrated irreparable harm in the absence of a preliminary injunction, the four-part test described in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 194–96 (4th Cir.1977), guides the court's discretion in granting or denying the injunction. Under *Blackwelder*, the court must consider "(1) the likelihood of irreparable harm to the [movant] if the preliminary injunction is denied, (2) the likelihood of harm to the [non-moving party] if the requested relief is granted, (3) the likelihood that the [movant] will succeed on the merits, and (4) the public interest." *Scott's Co.*, 315 F.3d at 271.

"In applying this four-factor test, the irreparable harm to the [movant] and the harm to the [non-moving party] are the two most important factors." *Sun Microsystems*, 333 F.3d at 526 (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991)). The balancing of these factors results in a "sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the [movant], and vice versa." *Id.*

■ As discussed above, the likelihood of irreparable harm to the Defendant in denying the preliminary injunction is low. Defendant offers no evidence that the Company is currently foundering or is improperly disposing of assets in an attempt to avoid the judgment of this court. Plaintiffs assert that the Company is financially sound and able to continue operations. There is, in short, no evidence on the record that the Company will be less likely to pay a judgment against it after a trial on the merits than it is today.

to grant such relief is well established as is     the analysis that guides that power.

Plaintiffs, on the other hand, argue that the Company faces significant harm if the injunction is granted, despite its sound financial condition. If required to post a $2,000,000 bond, the Company might have to use its established credit to pay for the bond premium or otherwise take actions that could tie-up its assets and restrict its day-to-day operations.

Because the balance of hardships favors the Company, Defendant must make a clear showing of the likelihood of success on the merits. *See Direx Israel,* 952 F.2d at 813, and cases cited therein. The parties here are engaged in a contract dispute to determine the effect and meaning of certain provisions of the 2002 Agreement. While Plaintiffs' reading of the contract is somewhat strained, it is not unreasonable, and presents substantial questions on the merits. Defendant has made no clear showing that she will prevail on the merits, and the "sliding scale" remains tipped against granting the preliminary injunction.[4]

The final *Blackwelder* consideration is the public interest. Here, no public concerns weigh heavily enough in Defendant's favor to warrant granting the preliminary injunction.

## CONCLUSION

Defendant has not demonstrated that the denial of her motion for a preliminary injunction ordering the Company to post a $2,000,000 bond will result in irreparable harm, nor has she demonstrated a likelihood of success on the merits clearly enough to tip the *Blackwelder* balance in her favor. Therefore, for the reasons set forth in this opinion, the court will deny Defendant's motion for a preliminary injunction.

4. For the same reasons, the court will deny preliminary injunctive relief pursuant to the

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Defendant's amended motion [Doc. # 21] for a preliminary injunction is **DENIED.**

IT IS FURTHER ORDERED that Defendant's motion [Doc. # 14] for a preliminary injunction is **DISMISSED** as moot.

North Carolina Uniform Fraudulent Transfer Act, N.C. Gen.Stat. § 39–23.1, *et seq.*