**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-2245**

───────────

2311 RACING LLC, d/b/a 23XI Racing; FRONT ROW MOTORSPORTS, INC.,

        Plaintiffs - Appellees,

    v.

NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC; JAMES FRANCE,

        Defendants - Appellants.

───────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Kenneth D. Bell, District Judge. (3:24-cv-00886-KDB-SCR)

───────────

Argued: May 9, 2025                                Decided: June 5, 2025

───────────

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

───────────

Preliminary injunction vacated by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee and Judge Thacker joined.

───────────

**ARGUED:** Christopher S. Yates, LATHAM & WATKINS LLP, San Francisco, California, for Appellants. Jeffrey L. Kessler, WINSTON & STRAWN, LLP, New York, New York, for Appellees. **ON BRIEF:** Tricia Wilson Magee, SHUMAKER LOOP & KENDRICK, LLP, Charlotte, North Carolina; Gregory G. Garre, Anna M. Rathbun, Christopher J. Brown, Christina R. Gay, Washington, D.C., Lawrence E. Buterman, LATHAM & WATKINS LLP, New York, New York, for Appellants. Danielle T. Williams, Charlotte, North Carolina, Jeanifer Parsigian, San Francisco, California, Scott P. Glauberman, Kelly Mannion Ellis, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellees.

NIEMEYER, Circuit Judge:

In entering a preliminary injunction in this case, the district court held that the plaintiffs were likely to succeed on the merits of their antitrust action against the National Association for Stock Car Auto Racing, LLC (NASCAR), and its CEO, James France, because NASCAR, as an alleged monopolist, required the plaintiffs, as a condition of doing business with them, to enter into a release for past conduct. Because that theory of antitrust law is not supported by any case of which we are aware, we conclude that it was not a likely basis for success on the merits and vacate the injunction.

I

NASCAR organizes and stages stock-car racing, including the NASCAR Cup Series, which includes several well-known races, such as the Daytona 500 and the Coca-Cola 600. To be guaranteed participation in the entire Cup Series, a racing team must sign a comprehensive "charter" agreement that establishes, among other things, the rights and duties of the parties, the rules of competition, the fees, and the division of income. The charter format originated as the result of negotiations between NASCAR and the Race Team Alliance, an association of racing teams. Following agreement on the charter format, 19 teams, including the plaintiff Front Row Motorsports, Inc., signed charter agreements in 2016, providing for the participation of 36 "chartered cars" in all Cup Series races. Several years later, in 2020 and 2021, the other plaintiff — 2311 Racing, LLC, d/b/a 23XI Racing — also signed charter agreements that it had purchased from other teams, entitling it to race in the Cup Series.

2

In anticipation of the expiration of the 2016 charters on December 31, 2024, NASCAR and the Race Team Alliance negotiated a revised charter for the Cup Series beginning in 2025. Like the 2016 Charter Agreement, the 2025 Charter Agreement included mutual release provisions that released the parties from claims for past conduct. Thirteen racing teams representing 32 chartered cars signed the 2025 Charter Agreement. 23XI Racing and Front Row Motorsports, however, refused to sign that charter, objecting to several provisions in the agreement. They believed that the agreement furthered the alleged monopoly that NASCAR had maintained over the years by its conduct and the charter agreements.

Shortly after refusing to sign, 23XI Racing and Front Row Motorsports commenced this action against NASCAR and its CEO for violations of Sections 1 and 2 of the Sherman Act. In their complaint, they alleged that "[a]lthough the 2016 Charter Agreement was an improvement over the prior economic conditions of the teams, it still was the anticompetitive product of NASCAR's unlawful monopoly over premier stock car racing in the United States." They alleged further that "[n]o stock car racing team can compete at the top-tier level in the United States without accepting the anticompetitive terms that NASCAR imposes." They requested declaratory and injunctive relief, as well as treble damages.

Within days of filing their complaint, 23XI Racing and Front Row Motorsports filed a motion for a preliminary injunction, requesting that the district court order NASCAR and its CEO to allow them to participate in the Cup Series races under the terms of the 2025 Charter Agreement but excising the release contained in the agreement, so as to allow them

3

to continue their antitrust suit against NASCAR. Counsel for the plaintiffs explained to the district court, "So what had happened is we had been negotiating, and we got to a point where we could not accept the agreement . . . because we couldn't accept releasing our antitrust claims."

The district court granted the motion and entered a mandatory preliminary injunction on December 18, 2024, as follows:

> Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with Defendants, must allow Plaintiffs to each enter two race cars in all NASCAR Cup races under the 2025 Charter Agreement terms applicable to all charter teams, with the exception that the "release" language in Section 10.3 of the 2025 Charter Agreement shall not be enforceable to the extent that it would release or bar Plaintiffs' claims in this action.

In support of its injunction, the court ruled that the plaintiffs were likely to succeed on their Section 2 claim because NASCAR, as a monopolist, could not "require that a party agree to release [it] from all claims that it is violating the antitrust laws as a condition of doing business." The court concluded that a "specific release of past conduct may be enforceable," but only if it did not involve a monopolist "condition[ing] entry into a market — here the NASCAR Cup Series — on the prospective entrant's agreement not to challenge the monopolist's conduct."

Shortly after entering the preliminary injunction, the court amended it by orders dated December 23 and December 26, 2024, making modifications that are not relevant to this appeal. From the district court's preliminary injunction, NASCAR and its CEO filed this interlocutory appeal. *See* 28 U.S.C. § 1292(a)(1).

4

II

Because a preliminary injunction grants relief, albeit temporarily, before trial on the merits, it is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted), "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). And it should be "granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). To grant such an injunction, a court must conclude that the plaintiff made a clear showing that it "is *likely* to succeed on the merits — along with the risk of irreparable harm, the balance of equities, and the public interest." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025); *Winter*, 555 U.S. at 22 (requiring that a preliminary injunction be awarded only "upon a clear showing" of entitlement to relief).

While we review preliminary injunctions for abuse of discretion, we apply an exacting standard that demands a clear showing that the necessary criteria have been met. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524–25 (4th Cir. 2003). And "this exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature." *Id.* at 525. Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter, rather than preserve, the status quo, *see id.* at 525–26, and therefore are "disfavored, and warranted only in the most extraordinary circumstances," *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

5

In this case, the district court ordered that the defendants "*must allow* plaintiffs *to each enter* two race cars in all NASCAR Cup Races under the 2025 Charter Agreement," as modified by the district court. Without that order, the plaintiffs' participation in the Cup Series races would not have been guaranteed because they refused to sign the 2025 Charter Agreement. The preliminary injunction was therefore mandatory rather than prohibitory, and the plaintiffs' showing of the requirements for relief must accordingly "be indisputably clear." *In re Microsoft Corp.*, 333 F.3d at 525 (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972) (Rehnquist, J., in chambers)).

Viewing the district court's preliminary injunction under this demanding standard, it is not clear, let alone indisputably so, that the antitrust theory advanced by the plaintiffs and adopted by the district court is likely to succeed on the merits, as necessary for a preliminary injunction. *See Winter*, 555 U.S. at 20.

While the plaintiffs' complaint alleged years of conduct and contract provisions that they claimed were anticompetitive, thus attacking NASCAR's entire business model, they requested *at the same time* that the district court order that they "be permitted to participate in NASCAR Cup Series events under the terms of the 2025 Charter Agreement (with the exception of the Release)." The plaintiffs therefore requested to participate in the very business that they sought to dismantle. The district court accommodated the plaintiffs' request, explaining that, while the plaintiffs alleged broader monopolistic conduct, it was relying on only one basis to grant the preliminary injunction. It stated, "Plaintiffs have a likelihood of success on their allegation that the Release is unlawful. The Court

6

emphasizes that it does not reach and expresses no opinion as to Plaintiffs' likelihood of success on their other Sherman Act claims . . . ."

As to the single ground that the release violated the antitrust laws, the court found that NASCAR had a 100% share of the relevant market, which it defined as "premier stock car racing teams in the United States." It then found that NASCAR's requirement of a release was, in and of itself, anticompetitive. As the district court summarized its theory, "Can a monopolist require that a party agree to release the monopolist from all claims that it is violating the antitrust laws as a condition of doing business? The answer is no."

But the court supplied no case law to support that theory. Indeed, we have found no case to support it, and the defendants claim that there is none. Rather, the court only cited cases holding that it may violate public policy for *an agreement* to operate "as a *prospective waiver* of a party's right to pursue statutory remedies for antitrust violations." (Emphasis added) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). But that case and the others cited were hardly relevant to the plaintiffs' claims because here there is *no agreement*; the plaintiffs refused to sign the 2025 Charter Agreement. And unlike the releases in the cases cited by the district court, the release in the 2025 Charter Agreement is *not prospective*. Finally, the fact that a release may violate *public policy* by being prospective does not make it *anticompetitive*, as required for a violation of the antitrust laws.

To prevail under Section 2 of the Sherman Act — the provision relied on by the district court in issuing the preliminary injunction — a plaintiff must show (1) that the defendant possessed monopoly power in the relevant market, and (2) that the defendant

willfully acquired or maintained that power through anticompetitive conduct. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

The district court found that NASCAR possessed monopoly power in a relevant market, but it failed to properly find that NASCAR acquired or maintained that monopoly power through anticompetitive conduct when it required a release to do business. The court proposed that the release itself constituted anticompetitive conduct, but the release did not address competition. Rather, it was a standard release provision that released all claims based on all sorts of prior conduct, including, NASCAR maintains, claims that it violated the antitrust laws. Specifically, the release provided for the "release and discharge" of NASCAR and related persons from all claims "arising out of or relating to the criteria used by [NASCAR] to determine whether or not to enter into, or to offer to enter into, a Charter Member Agreement with the Team Owner." And the agreement also included a reciprocal release benefiting team owners, including the plaintiffs had they signed the agreement, such that the agreement contained mutual releases. But even focusing on only the release given by the racing teams, there is "no prohibition in the statutes or in the policy behind the antitrust laws that prohibits the disclaimer of antitrust claims by a general release." *Va. Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 266 (4th Cir. 1971). The effect of such a release is to eliminate antitrust suits and others between parties doing business with each other, not to eliminate or injure *competition*.

Section 2 requires that the defendant have engaged in anticompetitive conduct — *i.e.*, conduct intended to "exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (quoting Robert H. Bork,

8

*The Antitrust Paradox* 138 (1978)).  Neither the plaintiffs nor the district court has shown how the release would have injured *competition*.  And absent anticompetitive conduct in the service of monopoly power, the law recognizes that parties are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  The offer of a contract for joint participation in business that includes mutual releases constitutes just what *linkLine* authorizes.

Nonetheless, the district court found that "[m]arket aspirants should not be forced to choose between participation in a market and the later assertion of their ongoing/future antitrust rights, nor should a monopolist be permitted to include in the market only those who consent to the monopolist's alleged wrongdoing."  That, however, is not an appropriate inquiry or observation.  Rather, the plaintiffs must demonstrate that they are likely to succeed in showing that NASCAR used its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).  The district court did not so find.

In short, because we have found no support for the proposition that a business entity or person violates the antitrust laws by requiring a prospective participant to give a release for past conduct as a condition for doing business, we cannot conclude that the plaintiffs made a clear showing that they were likely to succeed on the merits of that theory.  And without satisfaction of the likelihood-of-success element, the plaintiffs were not entitled to a preliminary injunction.  *See Winter*, 555 U.S. at 20.  We therefore conclude that the

9

district court abused its discretion in entering the preliminary injunction that it did. This is all the more true in view of the heightened standard for issuing a mandatory preliminary injunction and because the one here required two parties to engage in a business that one party claims to be illegal. *Cf. Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) (noting that "when the injury that the movant seeks to prevent through a preliminary injunction is . . . directly contradictory to the injury for which it seeks redress in the underlying complaint, then a preliminary injunction simply should not issue" (cleaned up)). We express no view, however, on any aspect of the pending case beyond those stated herein with respect to the preliminary injunction. Accordingly, the injunctions of December 18, December 23, and December 26, 2024, are hereby vacated.

IT IS SO ORDERED.