**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-2003**

---

JIMMORI ROBINSON; JEFFREY WEIMER; TYE EDWARDS; JUSTIN HARRINGTON,

Plaintiffs - Appellees,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant - Appellant.

----------------------------

STATE OF WEST VIRGINIA

Amicus Supporting Appellee.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  John Preston Bailey, District Judge.  (1:25-cv-00075-JPB)

---

Argued:  January 27, 2026                           Decided:  April 3, 2026

---

Before HARRIS and BENJAMIN, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Vacated and remanded by published opinion.   Judge Floyd wrote the opinion in which Judge Harris and Judge Benjamin joined.

---

**ARGUED:** Rakesh Nageswar Kilaru, WILKINSON STEKLOFF LLP, Washington, D.C.. for Appellant.   John Fulton Gianola, LEWIS GIANOLA PLLC, Morgantown, West

Virginia, for Appellees. **ON BRIEF:** Thomas Woodrow, Nishma Patel, Charlotte, North Carolina, J. Douglas Minor, Jr., HOLLAND & KNIGHT LLP, Atlanta, Georgia; Benjamin L. Bailey, Christopher D. Smith, BAILEY & GLASSER, LLP, Charleston, West Virginia, for Appellant. John B. McCuskey, Attorney General, Michael R. Williams, Solicitor General, Caleb B. David, Deputy Solicitor General, Emily C. Ahlstrom, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia.

---

FLOYD, Senior Circuit Judge:

Plaintiffs-Appellees Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington (collectively, the "Players") challenge the National Collegiate Athletic Association's (NCAA) so-called "JUCO Rule"—which counts time spent and played at junior colleges (JUCOs) toward student-athletes' seasons and years of eligibility to play on NCAA teams—as a violation of the Sherman Antitrust Act of 1890 (Sherman Act), 15 U.S.C. §§ 1–2. The JUCO Rule had rendered the Players ineligible for the 2025–26 collegiate football season. The Players sought and the district court issued a preliminary injunction allowing the Players to participate in the 2025–26 collegiate football season. The NCAA appeals. For the reasons set forth below, we vacate the preliminary injunction and remand for further proceedings.

I.

The NCAA, like many other athletic organizations, creates "agreement[s] among competitors on the way in which they will compete with one another." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984). These agreements allow the NCAA to develop rules to promote uniform and fair gameplay—essential cooperation without which college sports would not exist in their current form. *Id.* at 101–02. But, on the other hand, formal agreements among competitors about employment and production can look like the type of "restraint[s] of trade or commerce" that may violate the Sherman Act. 15 U.S.C. § 1.

3

These rules create unique difficulty for judges. Courts across the country have struggled to categorize the procompetitive and anticompetitive effects of NCAA rules over the past four decades. Most recently, the Supreme Court found the NCAA could not impermissibly limit education-related compensation for college athletes. *NCAA v. Alston*, 594 U.S. 69, 84–85, 106–07 (2021).[1] Although the Supreme Court has dealt with NCAA *compensation* rules, it has not analyzed NCAA *eligibility* rules that determine who can play for college teams. The NCAA suggests these eligibility criteria preserve the unique character of collegiate sports by maintaining a connection between college sports and college education.

One such criterion is the Five-Year Rule. That rule lays out two distinct temporal limitations on student-athletes' eligibility to play on an NCAA team. First, it provides that "[a] student athlete shall not engage in more than four seasons of intercollegiate competition in any one sport," which we refer to at the four-seasons-of-competition component. J.A. 135 (NCAA Bylaw § 12.8). Second, it then provides as follows:

> A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester of quarter in which the student-athlete first registered for a minimum full-time program of

---

[1] Just this past year, the NCAA reversed decades of anti-compensation rules by agreeing through a settlement to allow member schools to pay players directly up to twenty-two percent of the revenue from media rights, ticket sales, and sponsorships with student athletes. *In re Coll. Athlete NIL Litig.*, 803 F. Supp. 3d 959, 975–76 (N.D. Cal. 2025), *appeal dismissed*, No. 25-4185, 2025 WL 2831020 (9th Cir. July 29, 2025) and *objections overruled*, No. 20-cv-03919, 2025 WL 3501920 (N.D. Cal. Nov. 13, 2025). This is commonly referred to as the *House* settlement. This is the basis for the advent of revenue-sharing by the universities with their players. The NCAA and the Big 12 Conference were both parties to that settlement. *See id.* at 969. West Virginia University (WVU) is a member of the Big 12 Conference and thereby is permitted to share its athletic revenues with Division I college student-athletes. J.A. 600.

4

studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted.

*Id.* (NCAA Bylaw § 12.8.1). We refer to this as the five-year eligibility limit. The following ten pages of sub-rules to Section 12.8 provide specific criteria that the NCAA member schools use to identify eligibility such as determining the start of the five-year period (§ 12.8.1.1), methodology for waiving the Five-Year Rule (§ 12.8.1.7), and establishment of a hardship waiver to the Five-Year Rule (§ 12.8.4). The two limitations of the Five-Year Rule, read together, limit student-athletes to participating in four seasons of college competition across five years. A player's NCAA eligibility depends on both how many seasons of competition they play, as well as how many years they were enrolled in a collegiate institution.

While there are several exceptions to this rule regarding which years count towards a player's "clock," the clock generally starts running as soon as a player enrolls full time in a "collegiate institution" even if that institution is a non-NCAA school like a two- or three-year Junior College. J.A. 135 (NCAA Bylaw § 12.8.1). That is because the NCAA Bylaws define "collegiate institution" as one that is accredited at the college level by the Department of Education and authorized to offer at a minimum a one-year program of study, one that conducts an intercollegiate athletics program regardless of accreditation, or one that is located outside the United States. J.A. 221 (NCAA Bylaw § 14.02.4). The NCAA Bylaws also define "intercollegiate competition" as occurring when a student-athlete "in either a two-year or a four-year collegiate institution" either "(a) [r]epresents the institution in any contest against outside competition," "(b) [c]ompetes in the uniform

5

of the institution" or "(c) [c]ompetes and receives expenses . . . from the institution for the competition." J.A. 115 (NCAA Bylaw § 12.02.6). Thus, years spent studying at a JUCO count toward a student-athlete's five calendar years of eligibility, and seasons played in competitive sports at a JUCO count toward their four seasons of competition in that sport. We refer to this inclusion of junior-college years in the NCAA's eligibility calculations as the "JUCO Rule."

Relevant here and in response to an out-of-circuit district court's grant of a preliminary injunction,[2] on December 23, 2024, the NCAA Division I Board of Directors issued a blanket waiver of the JUCO Rule as to the four-seasons-of-eligibility portion of the Five-Year Rule, allowing another seasons of play for similarly situated players who had played at a JUCO. This became known as the *Pavia* waiver, and under it the JUCO Rule was waived only as to the 2025–26 academic year, and only for the four-seasons-of-competition limit. The *Pavia* waiver did not apply to the five-year eligibility limit of the Five-Year Rule.

Imagine a player enrolled at a JUCO for two years before transferring to an NCAA Division I school, ultimately playing football at both schools. Prior to the *Pavia* waiver, the player could only play two seasons at the JUCO and two seasons at the NCAA school because of the four-seasons-of-competition limit. But with the *Pavia* waiver, they could play for two seasons at the JUCO and then three seasons at the NCAA school before hitting the five-year eligibility limit, with their years at a JUCO not counting toward their four

---

[2] *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025).

seasons of competition.  Conversely, imagine a player who plays three years at a JUCO before joining an NCAA school.  Under this scenario, even with the *Pavia* waiver, the five-year eligibility limit of the Five-Year Rule prevents them from playing for more than two seasons at the NCAA school.

Finally, the NCAA Bylaws also provide a penalty for student-athletes who are ineligible under the terms of the bylaws or other legislation of the NCAA, but who nonetheless participate in intercollegiate competition pursuant to a court-ordered injunction that is subsequently vacated (the "Restitution Rule").  J.A. 146–47 (NCAA Bylaw § 12.11.4.2).  The Restitution Rule allows the NCAA Board of Directors to take corrective action in these circumstances.  The Board may vacate individual records, team records, team victories and/or individual awards, determine whether the institution is ineligible for NCAA championships and/or invitational or postseason meets and tournaments, or require that the institution remit to the NCAA the institution's share of television receipts and/or be assessed a financial penalty.  *Id.*

The Players allege that the JUCO Rule—specifically, the Five-Year Rule's inclusion of their JUCO participation towards their clock of eligibility—violates antitrust law.  Each of the Players played at least two years at a JUCO before transferring to a NCAA Division I school.  *See Robinson v. NCAA*, 803 F. Supp. 3d 481, 490–94 (N.D. W. Va. 2025) (explaining the Players' individual college football eligibility under the relevant NCAA eligibility rules).  Even after the *Pavia* waiver, the Players each would have been ineligible for NCAA Division I football for the 2025–26 season if the Five-Year Rule were to apply to them, because they had begun studying at a collegiate institution at least five

7

years prior, and the *Pavia* waver did not affect that five-year eligibility limit. College athletes across the country have recently challenged the applicability of the JUCO Rule and Five-Year Rule. *See, e.g.*, *Fourqurean v. NCAA*, 143 F.4th 859, 864 (7th Cir. 2025) (challenge to both components of the Five-Year Rule); *Elad v. NCAA*, 160 F.4th 407, 411 (3d Cir. 2025) (challenge to the JUCO Rule as applied to both components of the Five-Year Rule); *Pavia v. NCAA*, 154 F.4th 407, 411 (6th Cir. 2025) (challenge to the JUCO Rule as applied to the four-seasons-of-competition component of the Five-Year Rule). Undeterred as to their goal of playing college football for the 2025–26 season, each of the Players filed for an NCAA waiver to play football at West Virginia University (WVU), and the NCAA ultimately denied the waiver for each Player. J.A. 8–11.

On August 1, 2025, the Players filed this suit alleging violations of sections 1 and 2 of the Sherman Act as well as violations of state law.[3] On August 8, 2025, the Players filed a motion for temporary restraining order and preliminary injunction to request the court enjoin enforcement of the JUCO Rule (as to their five years of eligibility under the Five-Year Rule) and the Restitution Rule. The district court granted that motion in an order issued August 20, 2025. The NCAA timely appealed the order to this Court, invoking our

---

[3] Plaintiffs bring ten causes of action against the NCAA: (1) tortious interference with the Players contractual relationship with WVU; (2) tortious interference with the Players' potential NIL contractual relationships; (3) breach of the contract between NCAA and WVU where student-athletes are the third-party beneficiaries; (4) promissory estoppel; (5) per se violation of the Sherman Act § 1; (6) alternatively, unreasonable restraint of trade in violation of the Sherman Act § 1; (7) denial of access to an essential facility in violation of Sherman Act § 2; (8) contract and combination in restraint of trade; (9) establishment of a monopoly in violation of West Virginia law; and (10) negligence. The Players seek a declaratory judgment, a restraining order and injunctive relief, as well as damages.

8

appellate jurisdiction under 28 U.S.C. § 1292(a)(1).[4] We *sua sponte* requested the parties brief the issue of mootness because the 2025–26 collegiate football season ended prior to oral arguments. The parties each filed supplemental briefs.

We first address whether this appeal is moot. Upon confirming a live dispute between the parties, we review the district court's issued preliminary injunction, ultimately concluding it was issued in error.

## II.

The mootness doctrine is a limitation on federal judicial power grounded in the "case-or-controversy" requirement of Article III of the U.S. Constitution. "[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (citation modified). Because the "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate . . . . it is not enough that a dispute was very much alive when suit was filed"; the parties must retain a concrete interest in the outcome of the litigation throughout all stages of the proceedings. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "Mootness is a jurisdictional question and thus may be raised *sua sponte* by a federal court at any stage of proceedings." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

---

[4] The NCAA filed a motion to expedite this Court's decision on the appeal, which we denied.

"While we review preliminary injunctions for abuse of discretion, we apply an exacting standard that demands a clear showing that the necessary criteria have been met." *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC* (*NASCAR*), 139 F.4th 404, 408 (4th Cir. 2025). "In determining whether the district court abused its discretion, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023).

III.

The lower court issued an injunction as to the JUCO Rule and Five-Year Rule that applied to the Players' 2025–26 college football season.[5] The 2025–26 college football season concluded in January 2026 and WVU's football season ended in November 2025. As such, we requested the parties provide supplemental briefing regarding whether this appeal is moot.[6]

---

[5] In their motion, the Players requested the district court enjoin the NCAA from preventing them from playing football immediately at WVU. The Players did not cabin their requested relief to the 2025–26 season. The district court limited the preliminary injunction to the 2025–26 season. *Robinson*, 803 F. Supp. 3d at 519–20.

[6] The NCAA does not make any arguments on appeal as to how the district court's injunction of the Restitution Rule was erroneous. Thus, any such argument is waived, and the district court's injunction of the Restitution Rule remains in place. *See Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) ("Failure of a party in its opening brief to challenge an alternate ground for a district court's ruling waives that challenge." (citation modified)). With the NCAA enjoined from applying the Restitution Rule to the Players, the penalties that rule would otherwise impose can have no effect on the Players regardless of our decision today, and it therefore does not contribute to keeping this appeal a live controversy.

10

We are always obliged to assure ourselves that a live dispute exists between the parties at all stages of litigation. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997). A dispute is moot when "the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citation modified). "And the parties lack such an interest when, for example, our resolution of an issue could not possibly have any practical effect on the outcome of the matter." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 336 (4th Cir. 2021) (en banc) ("A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (citation modified)). "For that to be the case, it must be 'impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Leaders of a Beautiful Struggle*, 2 F.4th at 336 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin*, 568 U.S. at 172 (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012)).

There is an exception to the mootness doctrine which provides that a matter is not moot if the issue is "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016). This exception applies "only in exceptional situations" where two conditions are met. *Id.* First, the challenged action is in its duration too short to be fully litigated prior to cessation or expiration. *Id.* And second, there must be "a reasonable expectation that the same complaining party will be subject to the same action again." *Id.*

11

In their supplemental briefing, the Players argue that the capable of repetition yet evading review exception does not apply here because the challenged action was not so short in duration as to avoid review and the 2025–26 college football season has ended and therefore is not capable of repetition. In contrast, the NCAA argues that the exception clearly applies because the challenged action was too short in duration to be fully litigated prior to the end of the football season and the expiration of the preliminary injunction. The NCAA also argues there is a reasonable expectation it will face similar challenges from other student-athletes and from one of the Players because Tye Edwards has sought a waiver of the NCAA eligibility rules to play the 2026–27 college football season. We review the two conditions in turn, ultimately finding the exception applies such that the appeal is not moot.

*First*, the challenged action was, at most, only meant to last the remainder of the 2025–26 football season, which included thirteen to fourteen weeks of regular season play with the possibility of additional postseason play. This is clearly too short in its duration to be litigated fully. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 671 n.1 (2025) (concluding that a period of three months is too short to complete judicial review of a challenged action's lawfulness); *Kingdomware Techs.*, 579 U.S. at 170 (finding a period of two years too short to complete judicial review); *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 514–15 (1911) (same). Given the brevity of the preliminary injunction, we find the first condition met and turn to likelihood of repetition.

*Second*, it is likely that the Players will return to court seeking similar injunctive relief for the 2026–27 college football season. The college football season is an annual

12

series of games that begins in late summer and lasts around five months (at most). A party seeking to avoid mootness must show a "reasonable expectation that the same complaining party [would] be subject[ed] to the same action again." *Kingdomware Techs.*, 579 U.S. at 170. A "mere physical or theoretical possibility" cannot satisfy this second prong; instead, there must be a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam). Thus, the question is whether the Players "will ever again be in this position." *Id.* at 483.

Preliminary injunctions in the context of college football seasons likely fall into a category of cases that would always evade review. We have held that even where an issued preliminary injunction is restricted to a time-limited season that has since concluded, the second condition may be met where there is a reasonable probability the same plaintiffs will raise the same challenge against the same defendant the following year. For example, in *Kramer v. Mosbacher*, 878 F.2d 134, 135–36 (4th Cir. 1989), we considered the appeal of a preliminary injunction granted to commercial fishermen and fishing businesses where the injunction had attached to the closure of fishing grounds after the year's fishing quota had been reached. We heard the appeal after the close of that year's fishing season, but ultimately concluded the appeal was not moot because "the yearly reevaluation of catch limits and closure orders" are circumstances too short to be fully litigated prior to their cessation and there is a reasonable expectation that the same group would be subject to the same action again. *See id.* at 136.

13

Similarly, in *Feller v. Brock*, 802 F.2d 722, 725 n.3 (4th Cir. 1986), we concluded that the appeal of a preliminary injunction that applied to a completed apple picking season was not moot because an annual pre-harvest dispute is a classic example of a problem capable of repetition, yet evading review. A year later, we suggested more broadly that whether a dispute occurs annually is a relevant factor in determining the applicability of the capable of repetition, yet evading review exception. *Cf. Senseny S. Corp. v. Dep't of Lab.*, 816 F.2d 673, 1987 WL 37099, at \*1 (4th Cir. 1987) (per curiam) (concluding that the propriety of the granted preliminary injunction was moot because "[t]here is nothing to be gained by deciding whether the district court abused its discretion in applying the preliminary injunction standards because the 1986 harvest has ended" and refusing to apply the capable of repetition, yet evading review exception because the bonus at issue "has not been shown to be an annual dispute"). College football seasons are necessarily too short to allow for meaningful appellate review, and the same issues repeat year after year. Consequently, challenges to collegiate athletics' eligibility rules likely fall within the category of cases that are capable of repetition, yet evading review.

Importantly, the challenged eligibility rules remain on the books, and the Players have standing to challenge them because they are affected by the eligibility rules for all future collegiate seasons so long as the rules remain in force. *See Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972) (explaining that the challenged action is capable of repetition yet evading review because the challenged laws remain on the books and the plaintiff has standing to challenge them again because he is among the group of persons affected by the presently written statute). The preliminary injunction enjoined the NCAA from deeming

14

the Players ineligible for the 2025–26 season.  However, Tye Edwards has already sought an eligibility waiver from NCAA for the 2026–27 college football season.  This creates a sufficient basis to find this second prong met because, should the NCAA deny Edwards' waiver, there is a demonstrated probability he will return to court seeking a preliminary injunction as to the 2026–27 season and will do so by raising the same claims presently before us.  *See Feller*, 802 F.2d at 725 n.3 (explaining that an annual dispute is a classic example of a problem capable of repetition, yet evading review).  As such, the case is not moot because it is capable of repetition yet evading review.  Thus, we turn to the lower court's issuance of the preliminary injunction that the NCAA challenges on appeal.

IV.

Because a preliminary injunction grants relief, albeit temporarily, before trial on the merits, it is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted), "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  And it should be "granted only sparingly and in limited circumstances."  *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).  "To grant such an injunction, a court must conclude that the plaintiff made a clear showing that it 'is *likely* to succeed on the merits—along with the risk of irreparable harm, the balance of equities, and the public interest.'"  *NASCAR*, 139 F.4th at 408 (quoting *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025)).

15

To obtain the "extraordinary relief" of a preliminary injunction, the Players must establish the four so-called *Winter* factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. We review these factors to determine whether the district court abused its discretion and we may reverse and vacate a granted preliminary injunction if the lower court erroneously found any one of the factors met. *See Henderson for NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief.").

"[T]his exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). "Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter, rather than preserve, the status quo and therefore are disfavored, and warranted only in the most extraordinary circumstances." *NASCAR*, 139 F.4th at 408 (citation modified). In this case, the district court ordered that the NCAA grant WVU and/or the Players' waivers of any NCAA eligibility rule and declare the Players eligible to play for WVU for the 2025–26 season. *Robinson*, 803 F. Supp. 3d at 519–20. The preliminary injunction was therefore mandatory rather than prohibitory, and the Players' showing of the requirements for relief must accordingly be indisputably clear. *See NASCAR*, 139 F.4th at 408–09.

We start with the Players' likelihood of success on the merits. The district court found that the Players demonstrated a likelihood of success on the merits as to their

16

section 1 claims.[7]  *Robinson*, 803 F. Supp. 3d at 505.  "Although this inquiry requires plaintiff seeking injunctions to make a clear showing that they are likely to succeed at trial, plaintiffs need not show a certainty of success."  *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citation modified), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022).  The NCAA contends that the district court erred in assessing the likelihood of success on the merits when it (a) ignored out-of-circuit precedent to find that the Sherman Act applies to the NCAA, (b) failed to define the relevant market, (c) found anticompetitive effects, and (d) disregarded procompetitive justifications.

Reviewing the district court's preliminary injunction under the demanding standard required for mandatory preliminary injunctions, it is not clear, let alone indisputably so, that the Players' antitrust theory as adopted by the district court is likely to succeed on the merits.  *See Winter*, 555 U.S. at 20.  The district court's errors of law with respect to the Players' likelihood of success on the merits are such that we need not reach the remaining *Winter* factors to reverse.  *See Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018) (explaining that "*each* of the[] four [*Winter*] factors must

---

[7] In the district court, the Players provided arguments as to their likelihood of success on the merits as to their negligence, tortious interference, contract and promissory estoppel, and section 1 antitrust claims.  Though the Players suggested they were likely to succeed on all their antitrust claims, they restricted their likelihood of success on the merits arguments as to section 1 of the Sherman Act under the per se and rule of reason frameworks and failed to provide any section 2 arguments or arguments based in West Virginia antitrust law before the district court.  On appeal, the Players restrict their arguments to a likelihood of success on their Sherman Act section 1 rule of reason claim.  As such, we similarly restrict our review to the Players' likelihood of success on the merits of their Sherman Act section 1 rule of reason claim.

be satisfied to obtain preliminary injunctive relief" and that it is "unnecessary to address all four factors when one or more has not been satisfied").

We begin our analysis by considering the threshold question of the general applicability of the Sherman Act before turning to the district court's application of Sherman Act section 1.

## A.

We first must determine whether this dispute falls under the broad applicability of the Sherman Act. We ultimately conclude that it does.

Section 1 of the Sherman Act provides that, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (emphasis added). The NCAA first argues that this case is not properly brought under the Sherman Act because the challenged eligibility rules under the NCAA bylaws are not commercial behavior, and thus they are not restraints of trade or commerce. *See Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 540 (4th Cir. 1998) (explaining that section 1 does not prohibit noncommercial behavior); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) (explaining that the Sherman Act was enacted to prevent "restraints to free competition in business and commercial transactions"). We must review the eligibility rules based on their commercial or non-commercial nature, not the nature of the NCAA overall, because "the dispositive inquiry is whether the *transaction* is commercial, not whether the *entity* engaging in the transaction is commercial." *Va. Vermiculite, Ltd.*, 156 F.3d at 541.

18

The district court noted that "[n]o binding precedent categorizes all NCAA eligibility rules as commercial in nature." *Robinson*, 803 F. Supp. 3d at 496. It then concluded that a post-*Alston* world of NIL compensation meant that the rules challenged here are commercial in nature and therefore subject to the Sherman Act because they dictate the number of years a student-athlete can market and profit from an NCAA Division I career. *Id.* at 497.

The NCAA argues that the challenged rules are not related to the NCAA's commercial or business activities because they primarily deal with a student-athlete's eligibility. The NCAA suggests that such an interpretation accords with sister circuit precedent that was not overruled by *Alston* and observes that other courts since *Alston* have considered the same arguments and agreed that the rules are not commercial in nature. In contrast, the Players argue that because the eligibility rules are specifically used to exclude prospective laborers from the market to protect the NCAA's unique product, the rules are commercial in nature and thereby subject to scrutiny under the Sherman Act. The Players emphasize that eligibility to play college sports also makes the players eligible to share in revenue and earn from NIL such that the eligibility requirements are commercial requirements. We start with binding Supreme Court precedents that address the NCAA's actions under antitrust law.

Review of *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), does not clearly identify whether NCAA eligibility rules are commercial or non-commercial. *See id.* at 102. At most, the Court suggested NCAA eligibility rules are procompetitive, which implies that they are commercial. *See id.*; *cf. id.* at 121 (White, J.,

19

dissenting) ("[T]he Court errs in treating intercollegiate athletics under the NCAA's control as a purely commercial venture in which colleges and universities participate solely, or even primarily, in the pursuit of profits."). The Court observed that the NCAA's collusive behavior is only permissible because "a certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is preserved." *Id.* at 117 (majority opinion). It explained that horizontal restraints on competition are essential if the product of college sports is to be available at all. *See id.* at 98–105. It specifically gave the example that leagues require the joint establishment of certain rules such at the "size of the field" or the "number of players on a team." *Id.* at 101. Indeed, "[i]n order to preserve the character and quality of the 'product,' athletes must not be paid, must be required to attend class, and the like." *Id.* at 102. The Court found that these eligibility restrictions in fact "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive." *Id.* To be sure, the majority in *Board of Regents* primarily focused on the NCAA's rules limiting universities' broadcast rights and it contrasted the procompetitive effects of certain eligibility rules with the broadcast rules that it found in violation of antitrust laws. *See id.* at 98–105. But the language heavily implies that eligibility rules should be considered presumptively procompetitive. *See id.* at 117 ("[M]ost of the regulatory controls of the NCAA are justifiable means of fostering

20

competition among amateur athletic teams and therefore [are] procompetitive because they enhance public interest in intercollegiate athletics.").[8]

Almost four decades later, in *Alston*, the Court echoed some of its prior conclusions from *Board of Regents*.  It observed that "[w]ithout some agreement among rivals—on things like how many players may be on the field or the time allotted for play—the very competitions that consumers value would not be possible." *Alston*, 594 U.S. at 90; *see also id.* at 110 (Kavanaugh, J., concurring) ("Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing.").  But it cautioned that though *some* restraints are necessary, that does not mean *all* aspects of the interleague cooperation are.  *Id.* at 90 (majority opinion).  It noted that an abbreviated review (i.e., quick look) of restraints is appropriate for those rules "necessary to produce a game," though a fuller review (i.e., rule of reason) may be appropriate for others.  *See id.*  But it expressly rejected any suggestion that the NCAA was exempt from the Sherman Act because the challenged

---

[8] In the wake of *Board of Regents* but prior to *Alston*, courts typically refused to subject the NCAA's eligibility rules to antitrust scrutiny.  *See, e.g.*, *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (recruitment eligibility rules); *Smith v. NCAA*, 139 F.3d 180, 185 (3d Cir. 1998) (postbaccalaureate institution eligibility rules), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999); *Gaines v. NCAA*, 746 F. Supp. 738, 743–45 (M.D. Tenn. 1990) (no-draft and no-agent eligibility rules); *Bowers v. NCAA*, 9 F. Supp. 2d 460, 497 (D.N.J. 1998) (minimum academic course completion eligibility rules); *Jones v. NCAA*, 392 F. Supp. 295, 303–04 (D. Mass. 1975) (professional paid athlete eligibility rules); *see also O'Bannon v. NCAA*, 802 F.3d 1049, 1066 (9th Cir. 2015) (distinguishing commercial and non-commercial NCAA eligibility rules and observing eligibility rules have typically fallen in the latter category).  *But see Agnew v. NCAA*, 683 F.3d 328, 341–44 (7th Cir. 2012) (suggesting that all NCAA bylaws are subject to the Sherman Act and that most eligibility rules are presumptively procompetitive).

21

restrictions "happen to fall at the intersection of higher education, sports, and money." *Id.* at 94.

Courts have found the question of whether eligibility rules are commercial to be a close issue in the wake of *Alston*. On the one hand, several courts have concluded that eligibility requirements are not commercial because there is no money guaranteed from participation in Division I football. *See, e.g., Goldstein v. NCAA*, No. 3:25-cv-00027, 2025 WL 662809, at *4 (M.D. Ga. Feb. 28, 2025) (describing the *Alston* decision as "more scalpel than ax" and concluding that the Five-Year Rule is not commercial in nature and thus not subject to antitrust scrutiny); *Coley v. NCAA*, 792 F. Supp. 3d 634, 643–44 (E.D.N.C. 2025) (same); *Brzovic v NCAA*, No. 2:25-cv-02885, 2025 WL 1370758, at *4 (D.S.C. May 11, 2025) (same); *Johnson v. NCAA*, No. CV-25-60-M, 2025 WL 1790345, at *10 (D. Mont. June 26, 2025) (same). On the other hand, with the advent of revenue sharing and NIL compensation (sometimes facilitated by the educational institution), there is a legitimate argument that participation in college sports results in compensation such that eligibility rules are commercial and subject to review under the Sherman Act. *See, e.g.*, *Pavia v. NCAA*, 760 F. Supp. 3d 527, 537–38 (M.D. Tenn. 2024) (concluding NCAA's eligibility rules are commercial because only eligible players can negotiate NIL agreements), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025); *Braham v. NCAA*, 794 F. Supp. 3d 824, 833 (D. Nev. 2025) (concluding that the post-*Alston* collegiate athletic world means that eligibility rules are intertwined with commercial rules and benefits such that they are essentially commercial in nature), *appeal docketed*, No. 25-5040 (9th Cir. Aug. 11, 2025); *Martinson v. NCAA*, 804 F. Supp. 3d 1109, 1124–25 (D. Nev. 2025)

22

(concluding NCAA eligibility rules are commercial because they determine the ability of Division I athletes to participate in the labor market and be compensated for their labor), *appeal docketed*, No. 25-5962 (9th Cir. Sept. 22, 2025).

We join the two courts of appeals to have considered this question post-*Alston* in concluding that the challenged eligibility rules are subject to the Sherman Act.[9] *See Elad*, 160 F.4th at 414–15 (holding that *Alston* superseded the Third Circuit's prior precedent characterizing NCAA eligibility rules as categorically non-commercial); *Fourqurean*, 143 F.4th at 863. The challenged eligibility rules limit college athletes' participation in a labor market. *Elad*, 160 F.4th at 415. This restraint on labor through association rulemaking interferes with student athletes' free exercise of their rights to engage in commerce (i.e., participate in Division I football). *See Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 362–63 (1926) (applying section 1 of the Sherman Act to shipping associations' restrictions on seamen's access to the labor market); *Radovich v. Nat'l Football League* (*NFL*), 352 U.S. 445, 448–54 (1957) (applying section 1 to the professional football association's blacklisting of players who played football for a rival professional football conference). As such, we conclude the challenged eligibility rules are commercial and therefore subject to review under the Sherman Act. Thus, we turn to the merits of the Players' claim under section 1.

---

[9] We do not hold that all NCAA eligibility rules are per se commercial. We simply hold that the Five-Year Rule and the JUCO rule are not exempt from Sherman Act scrutiny. We leave other NCAA eligibility rules, which are not at issue in this appeal, for another day.

23

B.

We start by evaluating the appropriate method of analysis under section 1 of the Sherman Act. We then turn to the district court's proposed market definition. We ultimately conclude that the district court's errors in method of analysis and market definition drastically and incorrectly reduced the Players' burden of proof as to likelihood of success on the merits. These errors directly impacted the subsequent antitrust analysis such that we need not reach the lower court's analysis of anticompetitive effects, procompetitive justifications, or less restrictive alternatives.

1.

Section 1 of the Sherman Act prohibits agreements "in restraint of trade or commerce." 15 U.S.C. § 1. The "[Supreme] Court has long recognized that, in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (citation modified). "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" *Alston*, 594 U.S. at 81 (first quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); and then quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60–62 (1911)). In practice, there are three avenues of analysis under section 1 of the Sherman Act that apply depending on how obviously anticompetitive the challenged conduct is:

24

(1) per se liability,[10] (2) quick-look scrutiny, and (3) rule of reason analysis. *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013). "The boundaries between these levels of analysis are fluid, and they are best viewed as a continuum." *Id.* (citation modified). "Restraints that are not unreasonable *per se* are judged under the rule of reason," which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Am. Express*, 585 U.S. at 541 (citation modified). Rule of reason analysis requires "a three-step, burden-shifting framework," *id.*, whereas quick-look analysis directs courts to "undertake only a cursory examination before imposing antitrust liability," *Texaco*, 547 U.S. at 7 n.3.

The NCAA argues that the district court erred when it applied quick-look analysis. *See Robinson*, 803 F. Supp. 3d at 505 ("[T]he Court is comfortable on the record at this juncture concluding in the 'twinkling of an eye' that the Challenged Rules are restraints on trade with substantial anticompetitive effects."). When a court reviews using the "twinkling of an eye" framework, it typically means that they are using abbreviated rule of reason analysis, often referred to as "quick-look" analysis. *See Alston*, 594 U.S. at 88. We

---

[10] Certain kinds of restraints are illegal per se: agreements between two or more competitors to fix prices, otherwise known as horizontal price-fixing agreements, *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (per curiam); market allocation, *see United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); certain types of group boycotts or concerted refusals to deal, *see Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294–95 (1985); and some kinds of tying arrangements, *see Ill. Tools Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34–37 (2006). When challenging a restraint that falls within one of these per se categories, the Players can establish a violation of section 1 without evidence of anticompetitive effects. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–8 (1979). Though Players alleged a per se violation in the alternative in their complaint, they do not pursue this on appeal. Thus, we do not perform a per se analysis.

agree that it appears the district court may improperly have applied quick-look analysis here.

Abbreviated or "quick-look" analysis applies in cases where the anticompetitive or procompetitive effects of a restraint are sufficiently obvious, but the restraint does not fall neatly within a per se illegal category. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Quick-look analysis applies "only for restraints at opposite ends of the competitive spectrum" where "a quick look is sufficient for approval or condemnation." *Alston*, 594 U.S. at 88. It should be rarely applied because "[m]ost restraints challenged under the Sherman Act—including most joint venture restrictions—are subject to the rule of reason." *Id.*; *see also Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 290 (4th Cir. 2012) (explaining that rule of reason traditionally applies to joint venture cooperation that has possible procompetitive justifications). In other words, "[t]he rule of reason applies if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." *N.C. State Bd. of Dental Exam'rs*, 717 F.3d at 373 (citation modified). Quick-look analysis should only be deployed when "we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Alston*, 594 U.S. at 89 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007)). Indeed, because joint ventures like the NCAA have clear procompetitive benefits, those "often hard-to-see efficiencies attendant to complex business arrangements," "surely stand[] as a caution against condemning their arrangements too reflexively." *See id.* at 88–89; *see also Am. Needle, Inc. v. NFL*, 560 U.S. 183, 202–03 (2010) (applying rule of reason

26

after noting some procompetitive benefits of NFL football teams participating in a joint venture subject to section 1 scrutiny).

The Supreme Court in *Board of Regents* and *Alston* suggested that the only possible application of quick look analysis would be to benefit the NCAA.  In other words, the NCAA's eligibility rules may fall under the umbrella of procompetitive restraints subject to an abbreviated rule in the NCAA's favor—meaning that the Players would still face a heavy burden of proof for anticompetitive effects and the NCAA's burden for procompetitive justifications would be lessened.  The test for whether a rule falls under this umbrella asks whether the rule "is necessary to produce a game in the same way as rules about the number of players on the field or playing time." *Fourqurean*, 143 F.4th at 868.  A close read of *Alston* suggests that JUCO Rule and Five-Year Rule are one step back from those rules "necessary to produce a game." *See* 594 U.S. at 90.  Thus, the challenged rules are not subject to quick look in the NCAA's favor.

Instead, the NCAA rules challenged in this case clearly fall under the category of "restraints in the great in-between" that must be evaluated under rule of reason analysis. *Alston*, 594 U.S. at 88; *see also Fourqurean*, 143 F.4th at 868 (applying rule of reason analysis to review of the Five-Year Rule); *Elad*, 160 F.4th at 413 (applying rule of reason analysis to review of the JUCO Rule).  To the extent the district court applied quick-look analysis or "twinkling of an eye" analysis rather than the standard rule of reason analysis laid out in *Alston*, that was error. *See Robinson*, 803 F. Supp. 3d at 505.  In doctrinal terms, the district court erred when it drastically reduced the Players' burden of proving anticompetitive effects at the first step of its analysis.  Full rule of reason analysis should

27

apply here. The district court's apparent failure to apply the proper method of analysis alone weighs in favor of reversal because the lower court improperly reduced the Players' burden of proof.[11]

Moreover, even if we were to find that the district court intended to conduct a full rule of reason analysis, we would also conclude that it failed to require the Players to meet their heavy burden of proof as to anticompetitive effects. "To have an anticompetitive effect, conduct must harm the competitive *process* and thereby harm consumers." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (citation modified). "The reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Id.* Plaintiffs must generally have sufficient evidence to show actual anticompetitive effects within the product and geographic markets. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991). Actual detrimental effects on competition include reduced output, increased prices, or decreased quality in the relevant market. *Am. Express*, 585 U.S. at 542. The district court did not hold the Players to their evidentiary burden on this step of the rule of reason analysis—it failed to point to any record evidence showing that the JUCO Rule or the Five-Year Rule reduced output, increased prices, decreased wages, or decreased quality in the relevant market. *See Robinson*, 803 F. Supp. 3d at 500–02. Nor did the Players prove the NCAA's market power

---

[11] Given the ambiguity as to whether the error arose from quick-look analysis or an improperly lowered evidentiary standard for anticompetitive effects, we find it prudent to address the appropriate method of analysis to ensure that the lower court applies rule of reason analysis and not quick-look analysis when it reaches the merits of this suit.

28

in a relevant market and put forward a coherent "economic theory" as to how the NCAA's conduct "harms competition" by, for instance, increasing barriers to entry or reducing consumer choice through the exclusion of would-be competitors. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983–84 (9th Cir. 2023). To the contrary, the Players' theories of competitive harm are entirely undermined by their unproven market definition, as discussed below.

Normally, we might stop our analysis here, but in the interest of providing necessary guidance on remand, we also address the district court's market definition analysis. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 n.2 (4th Cir. 2007) ("[O]ur court regularly issues opinions to provide guidance on remand in the interest of judicial efficiency.").

## 2.

Before the court can assess whether the challenged rules have a substantial anticompetitive effect (i.e., reach the first step of the rule of reason analysis), on this record, it "must first define the relevant market."[12] *Am. Express*, 585 U.S. at 542. Indeed, in cases

---

[12] To be sure, plaintiffs challenging a "horizontal restraint"—a restraint of trade among direct competitors—need not always define the relevant market to establish anticompetitive effects. *Cf. Am. Express*, 585 U.S. at 542 n.7 (explaining that because horizontal restraints involve agreements between competitors not to compete in some way, a court need not always precisely define the relevant market to conclude the agreements are anticompetitive). However, cases that have sidestepped precisely defining the market have done so by otherwise demonstrating the horizontal restraints had an adverse effect on competition. *Id.*; *see, e.g.*, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (concluding that the finding of actual sustained adverse effects on competition, viewed with the common sense understanding that markets for dental services tend to be relatively localized, "is legally sufficient to support a finding that the challenged restraint was (Continued)

like this one, the rule of reason analysis requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's effect on competition. *Id.* at 541. Courts cannot properly apply this analysis without an accurate definition of the relevant market. *Id.* at 542–43. The relevant market is defined as "the area of effective competition," meaning "the arena within which significant substitution in consumption or production occurs." *Id.* (citation modified). In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes. *Fourqurean*, 143 F.4th at 869 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001)). The plaintiff bears the burden of proof on the issue of the relevant product and geographic markets in an antitrust case. *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983). Market definition is essentially a question of fact. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011).

The district court found that the Players proposed the correct relevant market: the "nationwide market for the labor of NCAA Division I college football players." *Robinson*, 803 F. Supp. 3d at 500. The district court observed that the NCAA argued that (1) the Players have not offered any evidence in support of their relevant market definition and (2) the Players' market analysis inconsistently includes and excludes JUCOs in its

---

unreasonable even in the absence of elaborate market analysis"). As explained above, the Players have put forward no such evidence. Thus, to show anticompetitive effects, the Players must define the relevant market, establish the NCAA's market power in that market, and advance some evidence (or at least a coherent theory) of anticompetitive effects in that market. *See Am. Express*, 585 U.S. at 542.

anticompetitive effects analysis. *Id.* at 499. But the district court did not meaningfully address the NCAA's arguments or consider any alternatives, but instead just provided a string cite to other court decisions defining the labor market for college athletes. *See id.* at 499–500. It otherwise made no factual findings relevant to the market definition. *See id.*

On appeal, the NCAA argues that the district court failed to establish a relevant market based on economic analysis. Instead, the district court improperly "accepted [the Players'] market definition and failed to make any findings as to whether that market actually exists." Opening Br. at 28. The NCAA contends that the lower court did so by relying on the market definition used in *Alston* despite acknowledging that *Alston* changed market dynamics and by relying on an expert report submitted in a different case (*Elad*) where that expert, in turn, relied on another case (*Pavia*) rather than referencing accepted economic frameworks.[13] In other words, the Players only offered "an economist's interpretation of legal opinions—rather than any analysis of data or current market conditions." Opening Br. at 20.

In contrast, the Players argue that the district court did not err in its market definition and, in any event, such a conclusion is a question of fact reviewed for clear error. Moreover, the Players emphasize that the market that served as the basis in *Alston* has not "disappeared in the age of NIL and revenue-sharing." Resp. Br. at 20. The Players also

---

[13] The Third Circuit in *Elad* has since expressly rejected the conclusions of the expert report that the Players provided as evidence. *See Elad*, 160 F.4th at 416–17 (concluding that the district court clearly erred in relying on the Dr. Maxcy expert report because the expert cited no market evidence or economic data and predicated his market findings on static markets that predated shifts to the college-football market after *Alston*).

contend that the district court's market definition is plausible because the court implicitly adopted Players' supporting evidence: citations to a chapter from an antitrust textbook, an expert report filed in *Elad*, an existing report from the Federal Reserve Bank explaining the student-athlete market, and other court cases.

We agree with the NCAA and conclude that the district court failed to properly define the relevant market.[14] First, the district court clearly erred by failing to make *any* factual findings regarding the market. *See Robinson*, F. Supp. 3d at 499–500; *see also* Fed. R. Civ. P. 52(a)(2) (requiring a district court to state the findings of fact and conclusions of law that support its action when granting or refusing a preliminary injunction); *Frazier*, 86 F.4th at 544 (explaining that a district court errs when it fails to state its factual findings and legal conclusions in its orders granting or denying a preliminary injunction).

Second, the district court erred when it did not engage in a fact-specific analysis of the relevant market despite the parties' differing opinions on the topic and instead merely adopted the Players' proffered definition. *See Robinson*, 803 F. Supp. 3d at 499–500. As the Third Circuit wrote in *Elad*, "[r]ule-of-reason analyses under Section 1 of the Sherman Act," when relying on a showing of market power, "require a well-defined relevant market and cannot rely on antiquated market definitions accepted on different evidence and in a different posture." *See* 160 F.4th at 417; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant

---

[14] An ill-defined market infects the remaining steps of the rule of reason analysis. As such, we do not reach the NCAA's remaining arguments as to anticompetitive effects or procompetitive justifications.

market with reference to the rule of reasonable interchangeability and cross-elasticity of demand[] or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient.").

We are not specifying the exact quantity of evidence required for an antitrust plaintiff to meet their burden of proof to establish market definition to be granted a preliminary injunction.[15]  We are merely holding that the Players presented no factual evidence here and therefore clearly failed to meet their burden of proof.

\*      \*      \*

We do not exclude the possibility that on a fuller record the Players will succeed in establishing their claim under section 1 of the Sherman Act.  But based on the record before

---

[15] As courts presiding over other NCAA cases have observed, there are many aspects of the market that should be considered when finalizing a market definition, at least at the merits stage.  *E.g.*, *Pavia*, 154 F.4th at 416–18 (Thapar, J., concurring); *cf. Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 471–73 (6th Cir. 2005) (demonstrating a legally sufficient relevant market analysis by defining a geographic market, identifying the relevant labor market, explaining the reasonable interchangeability of employees, and examining the cross-elasticity of demand between the various relevant sports leagues).  The district court's failure even to begin to undertake this analysis here leaves us with critical questions that ought to have been resolved below.  For example, is the correct market definition that of all college football (i.e., including NCAA Division I, II, and III as well as JUCOs) or is it just NCAA Division I?  Are players from Division II and III schools reasonable substitutes, such that these schools should be part of the market definition?  What about JUCOs?  Are any athletes choosing JUCOs over Division I schools and, if not, is it because of the JUCO Rule?  How does the availability of revenue-sharing change the market's recruitment?  How does foreclosing experienced former JUCO players from their would-be third and fourth years of NCAA competition affect the Division I football labor market?  Do NCAA Division I football teams compete with NFL teams for players post-*Alston*?  In short, "[t]he absence of cold, hard data is especially glaring in a market that is rapidly changing" and courts are put in difficult positions, even on motions for preliminary injunctions, where the parties have not established even a coherent theory that grapples with recent changes to the market.  *Pavia*, 154 F.4th at 417 (Thapar, J., concurring).

us, the Players have not met their burden and, consequently, the district court abused its discretion when it granted the preliminary injunction.

V.

For the foregoing reasons, we vacate the district court's order granting the Players' motion for a preliminary injunction and remand for further proceedings.

*VACATED AND REMANDED*

34